and others. And before we start, I realize that we're on a very tight time schedule for We may try to get to our questions very quickly for you, but I will also try to take into account, if you're getting a lot of questions, you know, we will certainly allow you to finish your thought and maybe have some more time. So we will try to run this as efficiently as we can. So we will begin then with case number one, United States v. Jones and others, Appeal number 21-405, etc. And Mr. Rayfield, are you the first one up? Good morning, may it please the Court. Mike Rayfield on behalf of Michael O'Bannon. I'll be addressing the Batson issue, which is common to four of the appellants, and then I'll address the sentencing issue that's specific to Mr. O'Bannon. So beginning with the joint issue, we've offered a number of legal and factual grounds for our Batson claim, including the overarching problem that the government's strike rates for black versus non-black jurors was grossly disproportionate. But I want to focus first on Juror 52, both because I think this is the most straightforward way of resolving the case and because I think the government's comments on that juror cast doubt on its entire approach. The government gave two rationales for striking Juror 52, one of which I would say is just nonsensical and the other of which is pretextual. And they're also basically impossible to reconcile, even with each other. First, the government said that Juror 52 had a, quote, agenda, that he essentially came to trial with some kind of deliberate plan to acquit the defendants regardless of the evidence. But all that happened is that Juror 52 was very briefly confused by a single word in a question posed by defense counsel. Counsel asked the jurors whether they understood that the defendants are, quote, considered not guilty until proven guilty. Juror 52 asked why he used the word considered rather than just, quote, just not guilty, and counsel responded that he phrased that correctly, which he did. Everyone agrees that this was an accurate statement of maybe the most important principle in our legal system, and the government didn't even argue that the tone of the comments indicated that he even felt strongly about the principle. So the notion that he had an agenda is, I would say, fairly baffling. So where do we get from there to the ultimate finding of intentional discrimination, which of course was where the judge finally landed? He said he just couldn't find intentional discrimination in the record. Well, the way you get there is that the government's agenda rationale was a pretext for intentional discrimination. Right. That's an argument made to the district court. The district court rejected it. It's a credibility determination. Can you point us to Batson cases that have reversed such credibility determinations? Well, yes. I mean, one example is this court's decision in Harris. Harris is an extraordinary case. I'm familiar with the facts. You don't have anything really comparable here. You've got a decision on credibility on the spot here, not three years later, not with reconstructed rationales. How do we find that's clearly erroneous? So another case I'll cite to your honor is this court's decision in McMath, where the district court essentially didn't give a meaningful explanation of the final credibility determination. All that happened here was that the district court just said, I find the government's response credible. It didn't explain why that response was credible, particularly in light of the extraordinarily disproportionate strike rates. It simply said it was credible and moved on. That is, and we would say that that is an error of law under cases like McMath and under cases that say you have to consider all relevant circumstances at Batson's third step. And rather than defending the agenda theory on appeal, the government basically argues for the first time that juror 52 may have believed that the presumption of innocence can't be overcome. So the government seems to be suggesting that juror 52, who was about to sit for a trial, believed that he had to return a not guilty verdict no matter what happened. And that theory, we would submit, doesn't hold up to any kind of scrutiny. And again, the district court. I agree with you that that's an extreme theory. But of course, the overall question was whether this peremptory challenge was tainted by racial discrimination. And the government also noted juror 52's concern about his particular business, which sounds like a very special, if he was dealing with Stradivarius violins, this is a very special business. And the government says, you know, well, we're worried about distraction. You know, he's, you know, let's keep this trial moving. Is he going to pay attention? You might not have worried about it, but if the district judge decides that the prosecution is at least not motivated by racial discrimination, then that's the end of it, right? Well, if it's true that the strike is not motivated by racial discrimination, absolutely. That is that is the ultimate question. But here's the problem. There are two problems with the hardship rationale, which I think what you're on. Yes, that's what I'm moving to because because the judge mentions both the judge did mention. Well, the judge didn't mention both actually, with respect to 52, he just said it's credible. But but there are two problems with that rationale. One is that the is that the government didn't ask juror 52 any questions about this issue during voir dire, even though it did ask other jurors about their potential hardships. And that's important because under the Supreme Court's decision in Miller L quote, the failure to engage in any meaningful voir dire examination on a subject, the state alleged it is concerned about. It's evidence suggesting that the explanation is a sham and a pretext for discrimination. The second problem is that the government didn't actually move to strike juror 52 for hardship or cause. No, the government didn't do that. And I realize the record is a little cleaner on juror 57 on this overlap of hardship and and cause. But nonetheless, during the hearing itself, the prosecution mentioned the concern about losing the clients. And I didn't see in your brief, you know, particular sometimes you see, you know, you struck so and so because they're a public school teacher. But it turns out there's a white juror who's a public school teacher and you didn't strike them. And so that's pretty powerful evidence of discrimination. But I didn't see that here with respect to the distraction rationale. Right. So I don't think we didn't we did give a comparative analysis with respect to 57 versus a juror 59 who had said that she couldn't be she couldn't be in court for a few days because of because of child care issues. But I think that you said they did not yet have everything lined up for a few days. Right. That's fair. That's it. And I don't I don't consider that to be an especially strong comparative analysis. I'll acknowledge that. But when you but I think that the government's failure to follow up on this issue entirely, but up until the Batson stage is a very strong indication of discrimination under Miller. And when you consider this, the two rationales together, when you consider the agenda theory alongside the hardship theory, it makes even less sense. The government's theory was that juror 52 was so sensitive to criminal justice issues that he had this deliberate plan to acquit the defendants, even if they were guilty, which is what an agenda is. If I can interrupt Mr. You have your brief convinced me that if the district judge had sustained the Batson challenge, we would have we would uphold that. But obviously, the district judge came out the other way. And it's not as though the government is saying we made a finding to this effect. You're critical of the use of hunches or intuition in the use of peremptory challenges. They're good arguments to be made. Peremptory challenges ought to be abolished altogether. I suspect that some of your colleagues I know at the at the defense table might not be happy with that with that innovation. But hunches and intuitions. Are part of this process, I think they are part of this process, but I think it's important to respond to that. One is it's important to know what the government actually said. The government didn't just say, I think this is going to be a pro defense juror. He didn't just say he didn't just say, I have a hunch that this juror is going to I'm looking at his tone. I have a hunch that this is not going to be a good juror. The government's lawyer said he has an agenda and he will have trouble focusing on the trial because of this, of his of his employment concerns. Or perhaps more accurately, I'm concerned that he might have an agenda, you know, and so you use the peremptory when when it's not. I mean, certainly if during the regular four year juror 52 had said, I don't believe in the criminal justice system, I'm going to vote to acquit anybody. You know, he would have been struck for cause. But he didn't say that he thought that the counsel here is why aren't they just not guilty? And maybe the government just is concerned that that there's too much of a thumb on the scale of acquittal. And my response to that is that is just simply impossible, not impossible. But I don't think that is a reasonable reading of what of what of what juror 52 actually said. All he did was clarify a slightly confusing formulation of the presumption of innocence offered by offered by defense counsel. And then when that that that was clarified, everyone just moved on and everyone was satisfied until the peremptory stage. Now, can I just alert you to the fact that if you wanted the three rebuttal minutes, you could either save them or if you use them, you're using them. Fair enough. I just want to close by saying on that and by saying when numbers like these are involved, when these kinds of strike rates are involved, courts are very careful to scrutinize the government's rationale. The district court didn't even consider these rates of actions third step, which in answer to Judge Hamilton's question, there are legal errors here. In addition to in addition to erroneous fact, it sounds like what you wanted the judge to do was give deliver an oral opinion. Right. Explaining all of the factors he considered in making the credibility determination. It doesn't have to be extensive, but it has at least it has to be an explanation. Says who says cases like that says I mean, I think I can. It's Stevens Stevens one says that you have to you have to that the district court fails to consider. I'm sorry. Stevens to the district court fails to consider material portions of the of the of the record and articulate explanations. That can be that can be reversible error. I do want to reserve the remainder of my time and I do it. Would it would it be possible for me to address the specific issue? Yes. Yes. You may do that. I'll give you some extra time. So, as the court knows, the government failed to respond to our main sentencing argument in its brief. We argue that that was waiver and the court then denied the government's motion to file a supplemental brief on the issue. The drug quantity, the drug quantity point, and I'm not sure whether that means the court is inclined to adopt our waiver argument, but I just wanted to reiterate that that would be the right approach under this court's decision in Cincinnati versus Eastern Atlantic. Where the court held that when the Kelly fails to respond to a non frivolous argument, it actually yes, it's in the appellant's position and that acquiescence operates as as a waiver. Now, if the court is inclined to reach the merits, I'm happy to address any questions. Otherwise, I'll reserve my time because I hadn't heard the government's response yet. I would like to ask you the the the pre sentence report for Mr. Oman paragraph twenty five refers to intercepted phone calls in which he's doing some, as I recall, some refer to some pretty large transactions. Is that information the judge could consider on the drug quantity that that is information that the drug that the judge could consider. But in our case, the legal in our situation, the legal error under this court's decision held in was the court's failure to make a specific reliability finding as to Jalen Coleman's not out of court statements about drug quantity. What about Colbyn's own statements in the intercepts? Those those could be considered in determining that that Mr. that Mr. Coleman's statements were reliable, but the district court, even after the defense objection, didn't make any make any analysis of this issue at all. Thank you. I will call on you for rebuttal next up cook. Good morning, I'm Jesse cook appearing for Jason read and be addressing the dual role testimony issue, which is common to all four of the trial defendants. Notwithstanding this court's acceptance of dual role testimony in cases where the government proffers its case agents as an expert under seven or two, and also elicit opinion testimony under seven or one. This court has long recognized the danger of unfair prejudice that can result from such testimony. Specifically, the very real potential for confusing the jury, which may not understand its own function in evaluating the evidence, or which may attach undue weight to the officers testimony by mistaking an expert opinion. For what is really only an eyewitness observation, or which may infer that the officer's opinion about the criminal nature of the defendant's activity is based on evidence beyond that, which was presented at trial. So, even if we were to agree with you that this is something of a model, and I think there's good reason to think that why would any error not be harmless and right? I think the most extensive portion of the evidence introduced by the government was the testimony of its primary case agent, Eric Collins, on all the wiretaps and so on, but the wiretaps were all interpreted, almost all, 200 of them, interpreted by Agent Collins, whose expert credentials and whose testimony as an eyewitness were inextricably intertwined, one with the other, and the fault of the court in not providing a clear, limiting instruction left the jury with no ability to make a determination when Collins was testifying as a 701 witness or as a 702 witness. The process that the government followed in this case was to introduce an exhibit, a recorded telephone conversation, or a text message, and then ask Agent Collins to address that exhibit to explain the meaning of the words, or the sentence, or indeed the entire conversation. And so what the jury received in this case basically was not an opportunity to consider what the meaning was for themselves of the exhibits that they reviewed, but rather just to hear what Collins believed these conversations entailed. Although lots, I mean, quite by design, lots of the vocabulary, let's say, was quite specialized. There's no reason even that this particular drug operation would use the same slang as, or the same code words as others. There was a limiting instruction, but I gather, just tell me if I'm right or wrong, that your position is that although the district court originally said it was going to give something largely drawn from the pattern instructions, in the end it kind of winged it and gave something that was extraordinarily confusing and that you have not, in fact, waived your challenge to that. That's your position? That is my position, yes. And I do think that limiting instruction, which the court said was given on the fly, was incredibly confusing. And not only was it confusing, but it contains multiple incorrect statements of the law, so that not only would the jury be less confused about the 701-702 distinction after hearing this limiting instruction, they would have received an incorrect statement of the law. And that would have been the only instruction that they received until the end of the trial during the final instructions when they would already have received and presumably considered the evidence. Ms. Cook, at least as I read the transcript, you convinced the judge in the colloquy to give, in essence, the Jet Parkhurst language, right? Yes, Your Honor. And then when Judge Sweeney actually delivered it, it was kind of with an introduction that basically described almost the daubered findings he had made. This is going to be reliable, this is going to be helpful, et cetera, which I found pretty extraordinary. But what other specific problems do you have with the instruction as given? Because he eventually got to the Parkhurst Jet language. Well, I think what the court did end up with is you have to distinguish between when they're giving an opinion and when they're talking about facts. But then the court goes on to talk about, you should consider the witness's qualifications and how he reached his conclusions, and the court thinks that this testimony will be helpful to you. So the court goes on to give an opinion about the nature of the testimony. The testimony will be the product of reliable principles and methods, which is basically their experience in this case. So we're just conflating the 701 and the 702 requirements into one, instead of instructing the jurors that they have to make a distinction between the expert testimony and the eyewitness or fact testimony. In fact, it tells them the exact opposite of what they should have been doing. Thank you. Okay, I think you need to wrap up. I'll let you finish your thought. We would ask that the court reverse the trial defendant's convictions on the drug counts based on the conflation of the expert testimony and the lay witness testimony. Thank you. All right, thank you, Ms. Coates. Mr. Hayes. Thank you, Your Honor. If it may please the court, my name is Charles Hayes. I represent Michael Jones, and I'd like to address the court very briefly on three points that relate to Michael Jones, as well as Co-Defendant Jason Reed, as to the 3B1.1 managerial role enhancement. The government argues in its brief that the application of this particular enhancement is harmless error, given the length of the defendant's sentence and the guidelines that were calculated for the total offense level. However, a defendant like Michael Jones, who's serving a 35-year prison sentence, the inability to participate in BOP programming for the First Step Act, which is preventing him from doing so through this enhancement, can also… He just gets the manager-supervisor level, though. He doesn't get leader Michael Jones. Correct. He doesn't get leader organized. But what happens with that particular enhancement is he's precluded from participating in BOP programming for the First Step Act. So a defendant like Michael Jones, who's serving a 35-year sentence, ultimately could do…end up doing an extra 10 to 12 years because of this particular enhancement. So we're requesting the court to adopt a position that this particular enhancement will never be harmless error to a defendant, regardless of how the criminal history category score is ultimately calculated. But isn't there a fair amount of evidence putting Michael Jones at that at least managerial level? There's the Galladay testimony, for example. Well, Your Honor, to respond to that point, in the district court's findings in the transcript on page 117, it found that Jones was the manager and supervisor of Thomas Jones and Rebecca Myers. The trial court did not find in its determinations in the transcript that he managed to lure Galladay in any manner. So although the government kind of chases that down in their appellee brief, that's not what the district court found. The district court found, as applied to Michael Jones – or, excuse me, as Thomas Jones, Rebecca Myers, both of whom are in family relationships with Michael and both who have their own independent connections to the drug trade, and never testified that he was a manager or supervisor to them. The court seemed to take this – the district court seemed to take a perspective that, in fact, Judge Sweeney said on page 98 of the transcript, quote, so it's just one person and one other person. I mean, somebody's always in charge, aren't they, if there's more than one person? And the district court found this enhancement in all four of the trial defendants. But the actual guideline commentary said that this role enhancement should not always apply. It should not apply as a matter of course. In fact, the court can give upward departures for defendants that it seems to be are more culpable than others. There needs to be specific findings, and there aren't specific findings in this case as to Michael Jones. In fact – You were going to talk about Reed also because I think that was another one that the government didn't respond to. Yes, and so briefly on that, Your Honor, Mr. Reed would request that the court take the position that it took – or that the O'Bannon attorney request takes as regards to the acquiescence of the arguments to Mr. Reed as to his sentencing things. And his managerial enhancement was very similar to Michael Jones's in that it was Melissa Baird who was in a romantic relationship with Jason Reed, and the court found that he managed her even though she had her own connections to Reggie Valentine. And so, Your Honor, what we're actually asking the court here to do is look at the perspective, number one, in Cologne, where the court found that this role enhancement should not apply as a matter of course in large-scale drug cases. There has to be more than just having a courier pick up drugs for you. You need to be telling them what to do, having control over them, and there just isn't that record here for Michael Jones. Is your view, Mr. Hayes, that coercion is necessary? Your Honor, I think that would be something that could be considered, certainly. It could be considered, but it's not necessary, is it? I think it should be necessary, but I don't know that the case law would – Why should it be necessary? I would think an effective leader or manager would be somebody who gets people to go along without explicit threats. Your Honor, I don't disagree with your line of thinking, but as it goes to Michael Jones, this is his nephew and this is his girlfriend that are doing things independent of him, maybe with him. But the analogy I would make is that if my wife asked me to go get milk today on the way home from court, that isn't a managerial supervision situation. That is two people working together for a common goal, which is what a conspiracy is. There shouldn't be this default position that there has to be somebody in charge of another person. There has to be specific findings, and with Michael Jones, that isn't what happened. And so what we're asking the court to do is to apply the standard in Cologne, but in Cologne the court found it was harmless there, that the guidelines were so high for Mr. Cologne that it didn't matter to go back and remand this for purposes of taking away the enhancement, although the Cologne case, the court said he is not a manager or supervisor. We're saying that, or we're requesting the court to find that this is always going to be harmful there given the ramifications now of the First Death Act. Okay. And the court's position was not supported by preponderance of evidence as to Michael Jones. All right. Thank you very much, Mr. Hayes. Thank you. Mr. Baldwin next. Good morning. May it please the court. Jeff Baldwin on behalf of Antoine Abbott. We raised three issues in our appeal. I'm going to concentrate on the denial of the motion, an evidentiary hearing on the motion to suppress unless the court has other questions. A viewing court will review the denial of an evidentiary hearing on a viewing court and to be entitled to an evidentiary hearing, the defendant must raise a substantial claim that's presented in their disputed issues of material fact. In this particular instance, the government based their search warrant on two instances, two wiretap phone calls in establishing probable cause, or they believe probable cause, for the search of 9-11 North Phillips. That was one call in early March and one call in April. One call in April did specify the 9-11 address. And the search doesn't take place until a couple of weeks later. Why can't we not even worry so much about the March exchange? I would argue you shouldn't, but it also... But it looks to me like based on what they were collecting thereafter, and even after the date that Mr. Abbott conceded that he had some interest in the house, he's kind of dancing down a narrow line here, right? But why wasn't there probable cause to believe that something would be at that 9-11 North Phillips address? Well, because the two wiretaps that they refer to are simply saying that is where he resides, not that there was any contraband there or that there would be any contraband there  And there was no establishing a nexus to the 9-11 for any continuing criminal activity, just that that's where he called his crib. But he also referred to a crib that was before in the March call that had nothing to do with 9-11 North Phillips, and they had no possessory interest in the property in March. And if the court would have granted an evidentiary hearing, we would have established that. And the March call is where he requests, he asks Valentine to send the drugs to his crib. Right, but it doesn't specify that address. But what difference would that have made? You have a warrant, right? Are you arguing that the police officers lied in obtaining the warrant? Is that your position? Because you have a neutral judge who issues the warrant. They act upon the warrant, so you're challenging that the warrant is not enough. It sounds like through an evidentiary hearing. What difference would that have made? Well, an evidentiary hearing would have established that there was a lack of probable cause for the magistrate to issue that warrant. But how so? The magistrate judge issued the warrant based on an affidavit, right? Yes. Okay, so that's it. I mean, you analyze was there enough information in the affidavit for the magistrate judge to issue the warrant or not? I don't understand what testimony, how does testimony advance whether or not there was enough information for the magistrate judge to issue the warrant? Because the affidavit said that the crib was 911 North Phillips and that we would have established that there were two different cribs. But how are the police supposed to have figured that out? Well, they knew that because they were doing surveillance. So are you, to follow up on Judge Kirch's question, are you saying that they pulled the wool over the magistrate judge's eyes? I would say that they left out maybe certain facts or had kind of painted with a broad brush that 911 North Phillips was the only residence for my client during that period of time. So he's claiming the theory would be that they had evidence that he had several more than one? Well, through their surveillance, I think we could have established that there was more than one address that he could have called his crib. And they were simply using that and establishing that that was 911 North Phillips. Okay, I think you should stop now. I will give you your rebuttal minute. Thank you. Ms. Jacobs. Good morning. May it please the court. Michelle Jacobs for the defendant, Terry Jones. With the limited time we have, I'm going to focus on the procedural argument unless the court has other questions that you'd like me to answer. At sentencing, the district court committed procedural error in making really unfounded, aggravated assumptions about Mr. Jones' criminal history. Can I tell you what I think about, I mean, at least it's a hypothesis that I'm toying around with. I think you've pointed to something troublesome, that there is no there there, that the judge sees this enormously long sentence for the $40 transaction, but then the judge imposes a sentence that's 100 months below the advisory range. And that's what judges do. If they think the guidelines based on the inputs that go into the guideline range are overstating or understating, whatever they're doing, if they're missing the mark, the judge has the authority under 3553A to adjust it. So why isn't that what happened here? Well, whether or not, I'm not sure we know if that's why he went 100 months under the guidelines, but what we do know is this court in Miller said that when these kinds of claims are preserved, and it's clearly preserved here, over and over preserved, right? And this is really the mistake that I think the government made, is the defense is not obligated to prove prejudice. In other words, that he would have given an even lower sentence. All we are required to do under Miller is to show that this court gave consideration to this erroneous information or erroneous assumption. And that, I think, in this case... Miller had the wrong count on felonies, if I remember correctly. There were actually two errors in Miller. Let me offer a potentially different reading of the transcript here, which was the defense counsel argued that this $40 transaction that led to a 25-year sentence was vastly overstated. Guideline calculation is correct, but you ought to go down. Not either as a departure or a variance. But the defense didn't have any information other than the $40 to explain and to support that. And the judge, in essence, the defense is inviting the judge to speculate. And then the judge does some of his own speculating. And ultimately just goes with the guideline calculation. And then, as Judge Wood points out, goes with an ultimate sentence that's way below the guideline. It seems to me that the judge might have been baited into some of that speculation. I disagree, Judge. I do not think that there is anything in this record that would suggest that the defense somehow baited him into speculating, that there was something more there. What the defense repeatedly said was, this is all we know. We know it was a $40 transaction with a confidential informant when this kid was 18 years old and he was given a 25-year sentence. And that the court ought to use that, as you say, to find that the criminal history was overstated. I'll just put it that way. That the criminal history is skewing the guidelines too long. What the district court did with that argument was, I don't know Indiana law, but there had to be something more there. At another point, he says, there's scant information. All we know is it was $40 to justify 25 years. There's got to be more there. At another point, when the probation officer said, there's not anything more there. We don't have anything more in the record. He says, well, there had to be some serious stuff going on there. And actually, in imposing sentence, on the same page of the transcript, where he starts to actually say what the number is going to be, he says, I don't know the whole story there. And that's why I'm rejecting the defense argument. I mean, I don't know how more clear it could be, given that Mr. Jones has a due process right to be sentenced on the basis of accurate information. For the judge to be making those kinds of assumptions, especially when, as we point out in the brief, the presumptive sentence at the time in Indiana. The judge says he didn't know that, and I get that. That was not part of the argument. But we know that the presumptive sentence at that time was 25 years. And that's what Mr. Jones got. I don't think there had to be any more there there. More to the story. You know, more serious stuff. And again, coming back to Judge Wood's question, I think to close, I think we've shown that the judge made these aggravated assumptions and because Miller says, that's really all we have to show. As long as the court considered it an imposing sentence, and he mentions it right before he imposes sentence, I would suggest that really the safest and the fairest course of action, given the findings and given the showing here, is that this case be remanded for resentencing. And I would encourage the court to do that based on our substantive unreasonableness argument. I appreciate the court has never found a sentence to be substantively unreasonable when it's below the guidelines. But this is a life sentence for an African-American young man, not young anymore, right, but a young man at the time who will spend his entire life, this is a life sentence, he will spend his entire adult life in prison for nonviolent drug offenses. So I would ask that the court vacate and remand for resentencing. All right, thank you very much. Mr. Brodnick. Thank you, Your Honors. Tom Brodnick on behalf of Pierre Riley. May it please the court. Your Honors, Mr. Riley is the only member of this drug conspiracy who was not located within Central Indiana. He was located in Atlanta. And for that reason, the government characterizes him as, quote, the leader, close quote, of the Atlanta component of this conspiracy. However, Your Honor, at best, what the government has established and what Mr. Riley admitted at his change of plea hearing is that he was the source of supply for the drugs that were ultimately sent to Indiana. Isn't that essential? I mean, you know, he is holding down, you know, a vital part of this conspiracy and the enhancement not only speaks of the number of people who may have been supervised, but also speaks about an otherwise extensive, you know, operation. And he's really right at the top of gathering the drugs together that fuel the conspiracy. Your Honor, I think the key word of what you indicated there is extensive operation. The case law that we have cited here, and I think that the government has cited many of these cases as well, is that supplying drugs and negotiating the terms of the sale of those drugs is not sufficient to justify a leadership enhancement. Being a large-scale distributor of drugs is not sufficient to justify an enhancement. Directing couriers on how and where to meet and to make those deliveries is not sufficient to justify the leadership enhancements. But what I would say is you can pick apart any one of those things that all of these cases depend on the overall picture and what the district court finds, and I assume this is clear error review, is that Mr. Riley's role in Atlanta is, there are two, there's no rule that there just has to be one. So why isn't this, on the totality of the evidence, why is this clear error defined? Because, Your Honor, in order to justify the leadership enhancement or the manager-supervisor, however you want to characterize it, the role enhancement, there must be active and ongoing organization or control. There's simply no operation of handing them off to couriers sent from Indiana by Mr. Valentine to pick those drugs up. There's no individuals for him to manage. There's no operation for him to manage or lead other than himself. Or at least the government didn't put that evidence in the record. Now, I have visions of Mr. Riley running all over the Atlanta area buying drugs, but maybe he was doing more, but it's not in the record. It is not in the record, that is correct, Your Honor. What about Ms. Kinney's testimony? Your Honor, I'm glad you brought that point. With regard to Ms. Kinney, I would concede that is the closest the government has come to show that he had some sort of leadership role over any individual in this case. However, as the government itself stated at Mr. Valentine's sentencing, they were up on the wires, had wiretaps on Mr. Riley's phone, had wiretaps on Mr. Valentine's phone, and the government argued, didn't concede, argued at Valentine's sentencing, and we've cited that in the record, that whenever Ms. Kinney was asked to do anything or whenever she asked to do anything, it was on Mr. Valentine's phone. It was not on Mr. Riley's phone. What about the hitman stuff? The hitman, Your Honor, clearly Mr. Riley played guilty to the murder-for-hire plot. Again, however, as we pointed out in the PSR, there is no role enhancement with regard to Mr. Riley for the murder-for-hire plot, and the government argued again in Mr. Valentine's sentencing and in Mr. O'Bannon's sentencing for the murder-for-hire plot. I don't see how you can have a, you can fail to have a role enhancement for the murder-for-hire plot for Mr. Riley, and then at the same time, his role in that creates a leadership role in the drug conspiracy. That makes no sense, Your Honor. Quick question, Mr. Brodnick, about the firearm enhancement for Mr. Riley. Yes. You make the point that he's nowhere near any of the firearms, but that argument seems to me to require us to separate the murder conspiracy from the drug conspiracy. I think it requires, Your Honor, to separate the individuals who possess guns in the murder-for-hire plot from the drug conspiracy. That is correct. My review of the case law and my reading of the sentencing enhancement that is found in the drug guideline requires guns to be possessed by a co-conspirator in the drug conspiracy. Can I ask you, you may be the wrong person to ask, I'm really not sure, but it seems to me critical to a number of the issues before us is the way in which the murder-for-hire conspiracy relates to the broader drug conspiracy, whether it's additional activity designed to further the drug conspiracy, whether they're just two separate unlinked conspiracies that are being charged. What's your position, at least, about how these two things relate? I think the testimony at trial, Your Honor, put on by Mr. O'Bannon was that and I think the position of the government would be my position as well, that Mr. O'Bannon believed that the individual that they had plotted to kill had committed an armed, violent robbery at his home and tied up his girlfriend, significant other, wife, and his kids and that was the genesis and the reason behind the murder-for-hire plot, Your Honor. So, not protecting the drug. So, your position, at least, I'm going to ask the government the same question, but your position is that they are actually two separate conspiracies and thus, guns used in one should not be used to enhance in the other. Correct, Your Honor, and I think the fact that the PSR does not sign a leadership role to Mr. O'Reilly for the murder-for-hire, to Mr. O'Reilly for the murder-for-hire plot leads into that conclusion. My time has expired. Thank you. It is. Thank you very much, though. All right. Mr. Mohabit. Good morning. May I please   Amir Mohabit, representing Appellant Derrick Owens. The issue raised on Mr. Owens' case is that there are two separate conspiracies that Mr. Owens' appeal is also joined into by co-appellants Valentine and Michael Jones. Your Honors, Mr. Owens did not go to trial. He pled guilt at the district court level and the issue raised on appeal is the one that was contractually preserved at the district court. Mr. Owens was sentenced, we believe erroneously, as a career offender because of three prior Indiana State cocaine offenses. One for possession, one for dealing, and another one for dealing. This brief for Mr. Owens was filed approximately a month before this court's ruling in U.S. v. RUF 966-F3-642. I acknowledge RUF stands for the opposite proposition that we are seeking this court to enter and that we are asking this court to effectively overturn this decision in RUF and its progeny that the government cites on page 91 of its brief. RUF is a relatively new decision. It is less than two years old. We think that it would be better law for the court to find, as we have argued in our brief, and that the district court's counsel, Mr. Garcia, who I now believe is Magistrate Judge Garcia, advocated in support of. So I take it that your position, I mean, clearly, you're preserving your argument, but your position is that this circuit is an outlier with respect to the RUF issue and that if we were to go your way, any conflict that the Supreme Court might be interested in would go away? I think so, Your Honor, at least based on the case law cited to in the appellant's brief. I cite to a case from the Second Circuit, Jerome v. United States, pardon, that was a U.S. Supreme Court decision, Second Circuit was United States v. Townsend, the Ninth Circuit had a decision, Lee Alvega, the Fifth Circuit has Gomez Alvarez, so yes, I think that there is a friction between the circuits, among the circuits. Well, there's the conflict, but usually if there's a conflict in the circuits, we say, well, there it is, you know, and if the Supreme Court wants to exercise its authority to resolve it, it will, but there are occasionally cases, you know, you might see 10 circuits going one way and one other circuit is off there in the wilderness going another way, and sometimes that one circuit, not just us, you know, that one circuit will say, actually, you know, we can join the majority. Understood, Your Honor. This is a guideline question, correct? It is, Your Honor, yes. So, it's the kind of split that we would ordinarily expect a sentencing commission to step in and resolve rather than the Supreme Court. In the spirit of advocacy, Your Honor, I'm here today asking this Court to overturn what it did enter in rule and perhaps that could resolve the issue as well. Do we have any information about the prevalence of positional isomers of cocaine on the streets of Indiana and the criminal prosecutions brought by the state? I am not aware of that, Your Honor. Perhaps the studies are out there, but I'm not aware of them. Thank you. All right. Well, I think your point is certainly on the record, so thank you very much. Thank you. All right. We will now hear from the government. That's right. I may please the Court. Brian Ratch of the United States. With the Court's permission, I'm going to take those issues as they were presented, starting with Mr. O'Bannon. That would be fine. I have my matrix names and issues. I'm sure we all do, and they're probably all just a little bit different. Mine was clearly a little insufficient. Starting with the Batson issue, as the Court pointed out, the District Court made clear credibility findings that the government here was credible and earnest, and there are race-neutral reasons, and Mr. O'Bannon and the defendants have not provided anything to undermine that. Do you think that's what this is all about, sort of empty mind, clear heart? If the government finds no intent to discriminate, we're not supposed to look at a blatant difference between the person who was struck and the people who remain? Certainly there are factors that could undermine. I agree that if something is false or implausible, the reasons that might undermine the credibility determination, but we don't have that here. If we look at the two reasons that juror 52 was struck, one, as your Honor said, there was the work hardship, seems pretty clear. But the judge didn't strike juror 52 for hardship like juror 57, but that's sort of not a cost strike, but that as a reason for underlying the government's race neutral reasoning was baked into the court's decision. The court looked at the government's reasons and said they were race neutral. That is supported by the record that there was the     didn't strike juror 52 for hardship like   sort of not a cost strike. The court looked at the government's reasons for underlying the government's defense said that this juror was obviously sensitive. So we weren't the only party that thought this was a little bit unusual. I think either party is fair game to be concerned that juror might not be a good juror for them and rely on their instinctual hunches. If the government lawyer misinterprets something a prospective juror says       reason why that particular juror was not a good juror, then the government lawyer misinterprets something a prospective juror said. And the judge finds the government's explanation to be credible. Like I said, even if it was based on mistaking. Isn't that the end of it? For us, as far as we're concerned, clearly if there's indicia that the government is lying, the government is flat out lying. Like Judge Wood mentioned the teacher example. I struck this person because they're a teacher. Well, they're actually not a teacher. The government misunderstood that they were a teacher. But then the government keeps a white sheet   like there's nothing wrong with that. They give that reason to the district judge and it says I find that to be credible. What business do we have with that unless the government lawyer is lie ing as to their reason. We think that's correct. The credibility determination that a district court judge is required to make incorporates those scenarios where one of the parties may be misunderstood but it is an earnest or credible misunderstanding. The question is whether it was pretext or lie ing is different than the government or the other party believed that's what the juror meant. The district court found they were credible in that belief. This court said in that situation it's implausible or something like that. Nothing in the  here demonstrates either implausibility or falsity. If there are no other questions I think all I can say is the court can affirm on any grounds. Moving on to Jason Reed and Ms. Collins . If the court wants to hear from me I'm happy to respond. I'm not interested in what you would have said. This court can affirm on any grounds. The circuit rules don't require a brief. This court can still look at the merits of the decision. We think because the court can affirm on any grounds it should look to what we argued below. The findings are in the record. This court can look to those. It may not have the benefit of our argument here. It might mean that for example the lack of a reliability finding vis-a-vis Mr. Coleman is a problem. Looking at the whole record de novo more or less is a different sort of exercise than a full adversarial presentation. We have said that the government waives its response at least. It just leaves us out there to do what we want. I think the standard view is discretionary as to what the district court judge found. You can't rely on what we said here but the question is whether the district court judge clearly argued for discretion and the judge's findings are in the record. Moving on to the testimony of Collins. We think the testimony here conforts with what Jet has said. The government prefaced its questions with either training and experience for expert testimony or understanding of the investigation. I thought the Collins stuff was a mess. I thought that limiting instruction which was not the one that the parties agreed to, it was the judge bringing it after quite a bit more was a disaster. He's essentially telling the jury this is reliable testimony, it is done in reliable ways. Those are jury issues. The judge has a gatekeeper role, certainly under 702 or 701. But to tell the jury this is words coming out of Collins' mouth are reliable, appropriate methodologies and so on is troubling to me. Your Honor, as Judge Hamilton said, eventually the jury will have to sort out the wheat from the chaff. The jury has heard an endorsement which is very unusual, at least in my experience. I don't think it's that much more unusual than a judge saying this person is an expert. Our district didn't used to have a  who would say that. I think  a   more unusual than a judge saying this person is an expert. I think it's a little more unusual than a judge saying this  is an expert.  don't think it's that much  unusual than a judge saying this person is an expert. I don't think it's that much more unusual than a judge saying this person is an expert. I            I don't think it's that much unusual than a judge saying this person is an expert. I don't think it's that much unusual  judge saying this person        more unusual than a judge saying this person is an expert. I think it's that much more unusual than a group of lawyers have the judges of the difference. Preかch the question with the layer experts. You can also hear the columns experts testimony was almost alright at the very beginning and then the government said we're going to transition into your understanding of this investigation. But that is essentially what this court has said to do in Jatin Parkhurst and after that transition there is only a handful of expert questions. One of them is what do you understand dot spot to be. So it's hard. I mean questions like that it's hard to understand whether it'd be any harm as well. It's the endorsement to that's bothering me really. I mean it's the jury's role to decide whom to believe and whom to disregard. On a related point if I could. This did not come up in defense counsel it's in the defense presentation but I was very troubled by the test of the testimony from the police officer about joint possession of methamphetamine and I'm trying to remember which defendant I'm talking about here but he is Michael Michael Jones. Thank you. OK. Where the police officer was being asked in essence whose do you think this was. And the district judge said what the officer believes at the time was relevant. And my question is relevant to what the the the searching officers beliefs have nothing to do with what the jury has to decide. We think that rule 704 allows that type of evidence. It's sort of relevant because to rebut the argument why not just put the officer on the stand and say do you think the defendant's guilty. You're an expert. You express your opinion on that. I don't think it goes quite that far. I mean but rule 704 allows. You cited a First Circuit case I think Crange to defend that. Yes. Crange was not remotely comparable. That was the the undercover agent explaining his dialogue with the target of the investigation. Having a searching officer express an opinion about which occupant or occupants of a joint residence possessed the contraband they found there. I've never heard of that. We think that that is squarely within rule 704. Lay witnesses are allowed to give their opinions and make inferences based on their first hand knowledge. And so you want your office to want to make that a routine practice in federal prosecutions in the Southern District. Ask arresting or searching officers do you think the guy is guilty. Well express your opinion to the juror here. Not that but an element is not exactly the same as guilt. I don't disagree that this is somewhat unique but it was in some ways to rebut the argument that it was Rebecca Meyers. You rebut that not with an opinion but with circumstances and facts. Let it go for now. I think next is Michael Jones first on the role. The evidence established that he had a managerial relationship with Thomas Jones, Gallaudet and Rebecca Meyers. We think that's clear and the judge made a finding on all those. I would say on the first step at homelessness I don't want to bind the government for future cases because the department may have an argument in the future but for purposes here while we don't think there's any harm we would agree that would render a harm based on the first step back at least for here. On Abbott we would agree that we're not really sure what an evidentiary hearing would have shown. The warrant established probable cause and it tied Mr. Abbott to that address. Whether he took possession of the house in mid or late March doesn't undermine the probable cause. There's certainly no evidence. Well there's an affidavit in the search warrant. The search itself went around April 23rd or so. I can't remember the exact date but it was the latter part of April. And information in the warrant as I understand, as I recall, wasn't just limited to this March phone call about taking something to my crib. You've got early April saying that he lives at 9-11 North Phillips and other things and I guess you've got reason to. So remind me what else suggests other than just sort of this trope that you know drug dealers keep their drugs at their house idea. What else is there to provide probable cause that some contraband would be found at the house. So there's probable cause that he was dealing drugs because he requested drugs from Ballantyne. This is relatively multiple times. Two, to pinpoint the house he referenced it as his crib. He was seen in April like April 5th or 4th or 5th call. Yes he references his crib. He said meet me here and was there. He was seen at the residence. His car was parked in the residence and then even though there's this estrangement of his wife that he's claiming the residence because he has to in order to maintain his right. I mean we don't think there is an expectation of privacy there anyway but just grappling with the probable cause. He in fact and we know why his car was there because of what the statements at the scene. He was actually sleeping in the car in the driveway for a little bit of time which was not. He wasn't allowed in the house but he was allowed to sleep in his truck and in the driveway which would from an officer's perspective is doing surveillance. If a vehicle is seen in the driveway and the person is there there's reasonable there's probable cause to believe he's staying in the house even though it turns out that he was locked out of the house. Yes. So there's that means there's no reasonable expectation of privacy but that did tie him to the residence at least but you know the officers have reason to believe that he was there. And then third I mean you're on a stroke but this court's precedents clearly state that officers and judges signing warrants can infer that a drug dealers residence will will contain evidence of drug dealing. So and whatever date that Mr. Abbott took possession of in March of the residence we don't think it's relevant considering incriminating evidence in April. OK. Before you run out of time I know this is going to take things out of order but I would really like you to comment on the relation between the murder for hire conspiracy and the drug conspiracy charged in count one. Of course you're right. I think the way that we in the court understood it was that the murder for hire was relevant conduct of the drug conspiracy because it was overlapping and intense and members the reason the murder for hire occurred is because of the drug conspiracy. So the conspiracy inside a conspiracy is it conduct made in furtherance of and reasonably foreseeable to the drug conspiracy people. So it was it was I don't think it was used anyone as reasonably foreseeable to anyone that wasn't within the murder for hire. Was the murder for hire foreseeable to Abbott. I don't I mean I think that probably is tenuous. But is it but it's clearly relevant conduct for the drug dealers to carry out the murder for hire. So tried to carry tried to carry out so so Ballantine O'Bannon and Riley. We're also being told you know this is an entirely separate retaliation for some right or wrong doing the KP. So what is what is the record tell us. So the reason that Ballantine and Riley wanted to carry this out was that they thought that KP was an informant. They enlisted O'Bannon because they knew O'Bannon had the ulterior motive that KP had evidently reportedly robbed O'Bannon's residence. So the reason it was carried out at the highest level was because of the drug conspiracy. Now O'Bannon's motivation may have been a little different. But if your opponents argue that it's really the whole thing is O'Bannon anyway that Riley at least was not in charge of it. Yeah we the the wiretaps don't support that if you the wiretaps Riley basically tells O'Bannon that yeah we need to do this or tell Ballantine and then Ballantine and Riley get together and Ballantine talks to O'Bannon. So was O'Bannon the boots on the ground. Yet yes he was because the people at the highest level of the drug and murder for high conspiracy used him to as the henchman to inoculate themselves from the conduct which is not unusual in any conspiracy. And that's why Ballantine and Riley were the two most culpable members of this conspiracy. I don't think you can get there with Riley. I mean this takes us to the role in the offense. Unless you can pull in that murder for hire. Otherwise Riley's just some guy who's buying a lot of drugs and passing it along to somebody else. We think we can. But again I would preface that by I hate the murder for hire from Riley's conduct with the drug conspiracy because of the reason the murder for hire was attempted to be carried out. But I think you can under the even accepting that I think you can under the Ramirez logic Riley was at the apex along with Ballantine in this drug conspiracy. So he had reason to presume that it was foreseeable to him that other members of the conspiracy including Ballantine who was his partner might have a gun in this multi interstate multi member large scale drug dealing ring. So we think of the Ramirez you can but the murder for hire punches it. Mr. Wrights can I ask you about what seems like a real anomaly in the guidelines in these cases. If I understand it correctly the murder for hire calculates out of about offense level 32 and ultimately has no effect on any defendants offense level. Is that right? Correct. I confess that that strikes me as bizarre and to the point of being irrational and kind of inviting 35 53 a consideration at least for those people who were directly involved. And obviously that's consistent with the sentences that they ultimately got. I mean we aren't inclined to agree with that. I will say that I didn't know that until this case and I saw that I would have thought the murder for hire would have driven the guidelines to that seems to be the most salient most culpable act that anybody took out in this overarching crime. But your honor is right that the members of the conspiracy that carried out that to get higher sentences. So could I take you to another issue that was not brought up concerning Thomas Jones and the gun enhancement for him. As I understand it Mr. Thomas Jones was never himself armed was never said to be in possession of a firearm. Nobody saw him together with other members of the conspiracy knowing that they were armed. I know there's the Mike he was around Michael Jones Bailey said Michael Jones was always armed but every time Michael Jones had an encounter with the police he was not. Well but OK. Well what I want to focus in on what I want to focus in on is the Everhart transaction which seems to be the specific the closest that anybody comes to time Thomas Jones to a gun and it's the other side of the transaction. Mrs. Everhart is has a gun on her hip and a gun in her glove box. This seems like an extraordinary stretch to say Mr. Jones Thomas Jones is liable for that. And why would Mrs. Everhart's be reasonably foreseeable to the rest of the ability. I mean the government's brief combines these things say oh Michael Jones has always got a gun. Yes he didn't have a gun this time but Mrs. Everhart in the bottom of her purse had one along with her one month old baby. You know that I honestly didn't see even if you accept the testimony that she sits in the car for a few minutes. Why would her possession of a gun be reasonably foreseeable to Thomas Jones. If I may answer that by starting with how that incident came up at sentencing and then spinning off from there I think maybe helpful. So at sentencing Thomas Jones said that in the one drug deal that he pleaded guilty to there was no gun. We responded that's not right because Everton brought a gun. Then I agree that that was used as one of the two independent factors that that Thomas got this from. We think it's better to consider that it's sort of a corroborating factor. We are that guns could be involved but we mainly think the best reason why Thomas should have the gun enhancement is because of the interaction with Michael. But that has nothing to do with the Everton. And the judge says what are we talking about here. Are we talking about just the Everhart Everhart transaction or are we talking about the whole count one conspiracy. And I read the transcript. He settles on the immediate transaction and there is no gun from Michael Jones or anybody else on that side of the deal. So I don't agree. If you look at page 49 of the sentencing transcript the judge relied on both Thomas's interactions with Michael and the Everhart deal. But there was an interaction with Michael in the Everhart deal. Yes there was. And Michael didn't have a gun. We don't we don't know that actually. Well there's no evidence in the record that Michael had a gun. I agree but there is evidence in the record that Michael always had a gun. We as Judge Hamilton said we know always is the wrong word. So some level of sometimes. So there are two instances that he evidently didn't have a gun. Well one was when him and Thomas and when Thomas and Michael fled police Michael jumped out of the car fled and was throwing drugs over a fence and Thomas was never arrested. So I don't know how you can credibly say that Michael didn't have a gun there or the gun was in the car and Thomas drove away with it. There was also another instance where Michael threw a gun out of a vehicle whenever he was arrested. So I think presuming that Michael didn't have a gun whenever he was driving doesn't work. And he was and I want to go back to be clear though Michael was arrested with he was arrested with a gun in April 2018. He was when his residence was searched he had four guns. Hold on for a second. Didn't they live together? Yes they did live together. Was that the residence where the guns were recovered? Yes. So why is it just not reasonably foreseeable in the drug conspiracy here to Thomas that Michael would have guns? Yes that is our point that because of their relationship. You're saying it has nothing to do with the Everhart transaction even though you have all this ink spilled about the Everhart transaction. There was no gun reasonably foreseeable to Michael there and if that's what the district I'm going to go back and look. I read that transcript a couple of times. The judge goes back and forth actually. You know how what are we talking about? Which aspect? Because if it's the conspiracy as a whole that's one thing. If he's just saying is there you know what's Thomas actually involved in? Thomas is kind of a minor player in all of this. May I answer? Yes please do. And we'll be hearing more from him. We may never finish this case. We think that the strongest argument certainly for Thomas having a gun reasonably foreseeable to him is his relationship with Michael who was always armed. They lived together. They worked together. They were caught together multiple times and we know that during the time that Thomas was out Michael had a gun. So Bradley testified that during this time from the fall of 2017 to March 2018 when they were dealing and Thomas helped that dealing Michael had a gun. We know that Michael had a gun in April of 2018 when Thomas was free and we know that Michael in the house that Thomas stayed according to Rebecca Myers Michael had four guns and that was when Thomas was out. So we think the strongest argument for foreseeability. He stayed at least some of the time. Apparently he was with his mother. Yes there's some discrepancy but he stayed there some with his relative that he was working with who was always armed. We think that is reasonable foreseeability. The Everhart is I agree that the judge relied on both. We think that Thomas Jones and Michael Jones relationship is much stronger and we think that's sufficient for foreseeability. The court has no further questions. Maybe we do. Hang on a minute. If there's anything else that we haven't asked you that you would like to add you may at least bring it up. Just you know quickly on Perry Jones because the court did have questions about that. We take your honor's concerns and we think the best way to interpret that is that defense counsel did his own speculation and the court rebutted that with his own speculation and the court knew that he didn't know the judge knew that he didn't know anything about that crime. So he used his own rhetorical speculation to undermine the defense counsel speculation. Here's the reason why it worries me. It's not that I think the court miscalculated the guideline you know the defense was the offense and it factored in. But if the court in scenario A the court thinks this is a $40 transaction and Indiana law happened to be very harsh about that at the time. So it yielded what it did. But I'm gonna adjust that you know and so I'm gonna go 100 months down. Scenario B the judge thinks there must have been something going on. Maybe he was you know brandishing the gun around children or maybe he you know in other ways was engaged in aggravating behavior which is why they threw the book at him and got this 25 years. Then his whole analysis under 3553A would be different or at least could be different because there's where he might have thought it's not really just 100 months it should have been 150 months or something. Should have been all the way down to the 15 years that he was arguing for. So I think it doesn't necessarily make a difference in the calculation of the guidelines but I think it could make quite a difference in the sentencing process as a whole. I would respond to that by saying the last thing the judge said about this at page 46 of the sentencing transcript was to sort of accept Perry Jones' argument that maybe the crime was driven by his addiction. So at the very end it seemed like the judge more than anything kind of accepted the defendant's speculation. All right apparently there are no further questions so thank you very much. Thank you and I'm sorry that my voice is failing me. No, no you should have taken a sip of water but anyways. All right so I have agreed to allow some rebuttal from the defense. Mr. Brayfield do you want to start? Thank you for the answer. As to Batson, all the government has said is that its two rationales, is that its rationales in the Batson stage were viable rationales. Now we disagree with that as to the agenda comment but it's important to go back to what the Batson test is which I think is what Judge Kirsch was getting at which is that it's not the accuracy of the rationales that matter, it is their honesty. And I think it's important to take them together. The government offered four total rationales, two of which were hardship rationale that it supposedly overlooked. So it supposedly overlooked two hardships as to the three black jurors that it struck. One was a rationale that the district court rejected which was based on juror 57's incarcerated son and one was the agenda comment which I think I've talked your honors ears off about. So if you take those in combination, I think the government's approach to the Batson issue is just not genuine. And second on that, last time on Batson is I don't want to lose sight of what I think are legal errors here. There are at least two legal errors. One is that the district court did not take, did not look at the challenge rates at Batson's third step which is required under this court's decision in Harris. Well, what about, did Nito just talk about that a couple of months ago? Judge Skudder wrote an opinion and said, look, we have such a small pool of minority jurors, the statistical analysis at step three is not all that useful. Well, there is, I think you're referring to a case called the United States versus Stevens and what the court. United States versus NITO, N-I-E-T-O. Okay, I'm not aware of that. It was decided this year. I apologize your honor, I'm not aware of that case. The court has made comments to the effect of the sample size sometimes being small enough that the numbers become difficult. But that's why it's so important to look at what we call the challenge rates which is the comparison between the number, percentage of jurors, of black jurors that are struck versus the percentage of black jurors in the qualified year. Right, in that case though, the government struck three of five Hispanic jurors and we concluded it makes it, the small number makes it difficult to draw significance from the disparity. Quoting from Bennett versus Getz. And I again apologize, I don't know what the strike rates were there. But the court reversed in the Harris decision with a challenge rate of about 219%. Here the challenge rate is 279%. The challenge rate for white jurors is 60% which means that it's five times that amount. And there's a legal error that the district court did not take those into account at that third step. There's also a legal error because the court again did not provide an actual meaningful explanation for the strike of juror 52. And I'm not saying that there has to be some lengthy exposition but under this court's decision in McNabb, 559 at third, 657, it is not enough to simply deny the Batson challenge and say that the court finds the explanation's credible. Okay, we're gonna have to leave it at that. I'm okay with it. Is it all right if I briefly address the O'Bannon issue? Sure, why not? Thank you. The government has said that this court can affirm on any ground. That's actually only part of the standard. Under this court's decision in Zimmer 662 at third, 448, the court can affirm on any ground that the government has not waived. And here the government has waived its response under this court's decision in the Cincinnati case. It is acquiesced in the argument. The government continues to take the position that. To take that position, what if a district judge got something totally 100% right, unequivocally right? The defendant appeals it. That happens from time to time, by the way. The government fails to respond to it. Under your analysis, we have to reverse. For what? That's not my analysis. That's under this court's precedence. And it makes, I mean, these rules exist for a reason. If Mr. O'Bannon had not raised an issue in his opening brief that may be completely correct, I couldn't credibly then argue to you that Mr. O'Bannon should be able to raise that issue for the first time in reply or an oral argument. These rules exist for a reason, and there's no reason to make an exception for the government. And as to here. The question is whether there's a different rule for appellee versus plaintiff. Right. And particularly in requiring the district judge to go back and redo something that he or she did correctly the first time. If that's what happened. I agree with that, and I think that issue is squarely addressed in the Cincinnati decision. Okay, I think we're gonna have to leave it at that. Thank you very much, Mr. Merrifield. For the next person I noted who wanted a little rebuttal was Mr. Baldwin. Do you have anything further? Thank you, Your Honor. Just briefly. I would point out that we have challenged that the warrant was established by probable cause and that we were entitled to an evidentiary hearing. This court's decision said because the resolution of a motion suppresses facts of specific inquiry, we give deference to credibility determination of the district court who had the opportunity to listen to testimony and observe the witnesses at the suppression hearing. We were denied that right here, and that was an abuse of discretion. This was a warrant that was established and issued on May 1st, referred to one phone call on March 11th, which is before Mr. Abbott had control of 9-11 North Phillips. The second phone call, April 8th, established that he referred to 9-11 North Phillips as his crib at that particular time. Then the warrant was not applied for until April 26th and executed on May 1st. There was no establishing any probable cause that anything would be at 9-11 North Phillips on April 26th. All right, thank you very much. Next, I have Ms. Jacobs. Thank you. Two points. The government's suggestion here that somehow the court ultimately accepted Perry Jones's criminal history argument is completely belied. At page 46 of the sentencing transcript, the judge says, he's talking about criminal history, and he says, I don't know the whole story there, and that's why I kept the criminal history where it is. I didn't think that warranted a departure. So the judge didn't accept Perry Jones's argument, just the opposite. The last thing I'll say, and I think it really goes to a question, Judge Hamilton, that you asked me at the beginning, and that was the sentence was already 100 months lower than the guideline range. Doesn't that sort of suggest that the court considered this? There was plenty of mitigation that the judge pointed out during the sentencing hearing, but as I just read, it wasn't this. And this court said in Miller, there is no harmless error standard that's applied to errors like this. If the information that the judge is relying on or considering in sentencing is improper or inaccurate, the defendant is entitled to a new sentencing hearing, and that's what he's here. All right. Thank you very much, Ms. Jacobs. Mr. Brodnick, do you have anything further? You don't have to wait until you get up to the podium. We don't want to miss any of your words for the record. Thank you, Your Honor. Just very briefly, with regard to the leadership issue, Judge Kirsch asked about with regard to Ms. Kinney, and I had mentioned that the government had indicated that, admitted that on the wiretaps, there was no communications with regard from Mr. Riley to Ms. Kinney, that all those communications were with Mr. Ballantyne. And I would also just want to point out that at the sentencing hearing that we had for Mr. Riley, Agent Collins testified, and on cross-examination, he admitted that Ballantyne was the one who instructed Kinney, and I will quote, on all of the day-to-day activities of his courts. So I think it's clear that Mr. Riley did not have any type of leadership role with regard to Ms. Kinney, or with regard to any part of this organization. Thank you, Your Honor. All right, thank you very much. And finally, Mr. Mohabat, any last words? Good morning again, Your Honors. The government didn't actually orally argue the point I raised in my appeal. I will just say that their brief consists of about two pages, none of which really goes to the analysis. The brief pertained to this issue, only about two pages long, none of which really goes to the issues raised in the appellant's brief. And the case they cite to on page 90, Lara Unzueta, 735F3-954 from this circuit in 2013, requiring the overturning and the compelling reason to overturn precedents, that case is just not on point. That case has to do with a defendant's illegal reentry who filed a motion asking Judge Derjagian to strike himself because at one time the judge worked in some capacity for the arguments. Very different facts, not all on point. I have nothing further to add. All right, thank you very much. Thank you to all counsel. I think you were all court appointed, and the court deeply appreciates your assistance to your clients as well as to the court. Thank you as well to Mr. Wright. It's a complicated case, and we will take it under advisement.